781 So.2d 650 (2001)
STATE of Louisiana
v.
Bobby D. LEWIS.
No. 99-KA-3150.
Court of Appeal of Louisiana, Fourth Circuit.
February 14, 2001.
Harry F. Connick, District Attorney, Jane L. Beebe, Assistant District Attorney, New Orleans, LA, Counsel for Plaintiff/Appellee.
*651 Bruce G. Whittaker, Louisiana Appellate Project, New Orleans, LA, Counsel for Defendant/Appellant.
Court composed of Judge BAGNERIS, Judge KIRBY, and Judge GORBATY.
KIRBY, Judge.

STATEMENT OF THE CASE
On April 30, 1998, the defendant-appellant Bobby Lewis was indicted for the second-degree murder of Lois Hilton. He was arraigned and entered a not guilty plea on May 6, 1998. Pretrial hearings were held over several dates. The trial court granted the State's motion to introduce evidence of other crimes on November 5, 1998. On November 11, 1998, the defense counsel moved to have the defendant examined by medical experts. The doctors' testimony was heard on November 24, 1998, at which time the trial court denied the motions to suppress the statement and identification and set the case for trial. After several continuances, trial commenced on August 2, 1999. After a recess, trial resumed on August 4, 1999. A twelve-person jury returned a verdict of guilty as charged. On August 11, 1999, after the defendant's oral motion for a new trial was denied, the court sentenced him to life imprisonment at hard labor without the benefit of probation, parole, or suspension of sentence. The defendant's motion for an appeal was granted.

STATEMENT OF THE FACTS
On the morning of March 8, 1998, a Sunday, David Warren was talking on the phone in his residence at 2522 Willow Street when he heard six or seven gunshots. He went out on his balcony and looked toward the nearby housing project but did not see anyone. After walking inside and then back onto the balcony, Mr. Warren looked again toward the project and saw a black male running from the apartments across the street. The male got into a car and drove away. Although Mr. Warren was unable to see the man's face, he did notice that he was very neatly dressed in starched blue jeans and a blue and white shirt and had a small to medium build. Mr. Warren was able to view the vehicle that the man entered; it was a brown Ninety Eight with a beige top. At trial, Mr. Warren identified a photograph of the defendant's car as looking very similar to the one he saw.
Officer Jeff Carradine responded to the call of a shooting on Third Street on March 8, 1998. He was the first officer on the scene and observed a woman suffering from multiple gunshot wounds; he also saw several pieces of personal property scattered about the parking lot of the apartment building. Officer Carradine at trial described the victim's clothing as "church going clothes." No one was near the victim when the officer arrived. Among the personal items belonging to the victim that were found on the scene were a bible, a broken umbrella, an envelope with foreign coins, and over $300 in cash.
Dr. Alvaro Hunt testified at trial that he conducted the autopsy on the victim. He identified six entrance wounds and two exit wounds in the victim's body. Dr. Hunt was able to retrieve four bullets from the deceased's body.
Warren Carter testified that he and the victim, Lois Hilton, were brother and sister. They had been very close, seeing each other approximately three times a week and always on Sunday for dinner. Mr. Carter further testified that the victim had been married, but her husband had died two years before her death. Mr. Carter denied that his sister had had any boyfriends following her husband's death.
Deborah Swayzer testified at the trial that she had been friends with the victim *652 since 1970 and attended the same church. During the Lenten season, they attended a prayer group together at the church every evening. Ms. Swayzer stated that, to her knowledge, the victim had not had any boyfriends.
Kenneth Leary, an expert in firearms identification, testified that he compared the four .38 caliber bullets recovered from the victim's body with each other and with two bullets recovered at the murder scene. The four bullets from the body all matched the .38 bullet found at the scene and were all fired from the same gun. However, the second bullet found at the scene was .25 caliber and could not have been fired from the same weapon.
Approximately one year before the murder of Lois Hilton, the defendant was arrested and charged for an aggravated burglary in St. John the Baptist Parish. The complaining witness was Ms. Hilton. At the time of the burglary, she was living in Laplace with a friend, Ms. Cecile Rising, and Ms. Rising's daughter. Ms. Rising had dated the defendant previously. The defendant was scheduled for trial in the burglary case on Monday, March 9, 1998, the day after Ms. Hilton's murder. The prosecutor was forced to continue the trial because of the death of Ms. Hilton.
After the trial was continued and before the defendant left the courthouse, he was approached by Lt. Grant Pierre of the St. John the Baptist Parish Sheriffs Office, who had been asked by New Orleans detectives to make contact with the defendant for questioning in connection with the murder of Lois Hilton. The defendant agreed to cooperate with Lt. Pierre and voluntarily accompanied him from the courthouse in Edgard across the river to the detective bureau on the east bank of the parish. Lt. Pierre advised the defendant of his rights before transporting him across the river. The defendant left his car in the parking lot in Edgard; it was later seized.
Once he arrived at the detective bureau, the defendant met with Detective Felix Joseph, Major Hay, and Detective Mims. The defendant was again given his rights, this time with a written waiver of rights form that was reviewed and executed by the defendant. The defendant agreed to give a statement. Initially, he gave the detectives an alibi, specifically that he was working on his car at his mother's house on Sunday morning. However, approximately an hour and one-half later he gave the detectives an inculpatory statement which was audio and videotaped and played to the jury.[1] Major Hay and Detective Mims testified at trial that the defendant was not coerced or threatened in any way to give his statement. Detective Mims admitted, however, that he did explain to the defendant the differences, including the penalties, between second degree murder and manslaughter.
In his inculpatory statement, the defendant said that he went to the victim's home to talk to her about dropping the burglary charge. According to him, Ms. Hilton began yelling and screaming at him and hit him with her umbrella. The defendant said he snapped, pulled out the gun from his waistband, and shot her four or five times, until the gun was empty. He had obtained the weapon the previous evening, but said that he did not intend to take the gun with him because he only wanted to talk to the victim. After the shooting, the defendant stated that he left in his brown Ninety-Eight Oldsmobile and threw the gun into Lake Pontchartrain.
In addition to participating in the interview of the defendant, Detective Mims was *653 lead homicide detective for the case. The detective testified that, to his knowledge, no physical evidence tied the defendant to the murder scene. Detective Mims further testified that no photographic line-up was ever conducted in connection with the murder because no one had seen the perpetrator's face.
During cross-examination, Detective Mims was questioned about a memo sent to him by another officer, which recounted a phone tip regarding the murder. The caller, who wished to remain anonymous, stated that the victim was killed by her exhusband or ex-boyfriend who had tracked the victim down after she left him for another man. The caller also stated that a woman living in the apartment building, Linda Tate, was comforting the victim after she was shot, and that the victim told Tate the shooter's name. Finally, the caller said that Linda Tate lived in the apartment building where the shooting occurred. According to Detective Mims, he was unable to locate anyone named Linda Tate.
The defense called a single witness, Lorna Green. Ms. Green stated that she knew the defendant and his mother because they had lived across the street from her. On the morning of the murder, Ms. Green and the defendant's mother left the home of the defendant's mother to go to church; this was a regular practice of the two women. When they left, at approximately 7:10 a.m., the defendant was working on his car. When they returned at 10:00 o'clock, the defendant was still working on the car. He was dressed in blue jeans and a shirt and overalls. When asked how she could recall that specific Sunday, Ms. Green stated that, ever since her husband died, she has kept a diary.

ERRORS PATENT
A review of the record reveals a single possible error patent. At sentencing, the defense counsel orally moved for a new trial; the court denied the motion immediately after the defendant was sentenced. La.C.Cr.P. art. 873 requires a twenty-hour delay between the denial of a motion for new trial and sentencing. La. C.Cr.P. art. 853 requires a motion for new trial to be filed and disposed of before sentence. However, La.C.Cr.P. art. 852 requires a motion for new trial to be in writing. In the instant case, the only motion was made orally. Therefore, we conclude that the trial court did not err in failing to rule on the improperly filed motion before sentencing. State v. Ballom, 96-1443, p. 2 (La.App. 4 Cir. 7/3/96), 678 So.2d 53, 54-55. Furthermore, in State v. Collins, 584 So.2d 356 (La.App. 4 Cir. 1991), this Court held that the failure to observe the delay would be deemed harmless error where the defendant did not challenge his sentence on appeal. Therefore, in the present case where no error is raised as to the defendant's sentence, which was a mandatory term of life imprisonment, the failure of the trial court to observe the delay period should be considered harmless error.

DISCUSSION
In his sole assignment of error, counsel argues that the trial judge committed reversible error when he admonished the defendant about his behavior in the courtroom. The appellant contends that the comments constituted a comment on the defendant's character, in violation of La.C.Cr.P. art. 772, which provides that a judge shall not in the presence of the jury "comment upon the facts of the case, either by commenting upon or recapitulating the evidence, repeating the testimony of any witness, or giving an opinion as to what has been proved, not proved or refuted." The court's comments were *654 made approximately halfway through the trial during the testimony of Major Hay:
I have to ask the Defendant at this time, I have observed it now for approximately 95 minutes. He will not be permitted to nod his head negatively or affirmatively in response to the answers that the witnesses are giving and then stare at the Jury. I find it, one, most importantly to be discourteous, regardless of the setting; two, because when in the Courtroom I find it to be distracting. I will not tolerate it. I will not permit it. The Jury is not in any way to be influenced by the defendant's actions, if you have observed them, nor are you to be in any way influenced by my comments. I will not tolerate it. It is ended. Thank you.
The defense counsel immediately asked the court to note his objection, at which point the trial court stated:
I will note the objection to protect the record. I know of no other way to police the proceeding, other than in the fashion I have just done.
I mean no disrespect to the Defendant nor to his attorneys. It is simply not tolerated. For that fact, if it was anyone else doing it in the room, I would call the same attention to the matter and seek to correct it in the same way. It is not in any way meant to be a particularized offensive remark. I don't deem it to be offensive in any way, but (sic) in any way directed to the Defendant in particular. It is only because he is the source of the problem that I have directed [it] to him. Thank you. I appreciate the courtesy of everyone.
This was not the first incident of this sort concerning this defendant. A review of the record reveals that during the testimony of Lt. Grant Pierre at the motion hearing on October 14, 1998, the witness complained to the judge that the defendant was making vulgar gestures at him. The court stated it was not aware of them, but issued a cautionary instruction to the effect that if the defendant was doing something he should stop.
In support of his argument that the trial court erred, the appellant cites Judge Plotkin's concurring opinion in State v. Matthews, 95-1245 (La.App. 4 Cir. 8/21/96), 679 So.2d 977. In that case, immediately after direct examination of a State witness, the court noted that the witness did not want to testify. Since the beginning of the trial, the defendant had been making certain gestures, which the court demonstrated. According to the trial court's comments before the jury, the defendant then had been "making direct glares at this unfortunate witness who" did not want to be there. Id. at 16, 679 So.2d at 987. The court further told the defendant, "I think it would be smart for him to stop it. If something happens to him [the witness], he'll be back in court I presume." Id. On appeal, the defendant argued that these statements by the trial court referred to other crimes; the majority opinion noted that there had not been a contemporaneous objection to the trial court's comments and that, in any event, they were not a reference to other crimes. Id.
In his concurrence, Judge Plotkin opined that the trial court's comments "exceeded the confines of judicial propriety" in that they were a comment "on the defendant's demeanor in the presence of the jury" that "impugned the character of the defendant and bolstered the credibility of the State's witness." Matthews, 679 So.2d at 989. Judge Plotkin further noted that such comments were clear error and a clear abuse of discretion, but in light of the circumstances of the case, the error was harmless. Id.
In reaching the conclusion that the comments were clearly improper, Judge Plotkin *655 distinguished State v. Roberts, 541 So.2d 961 (La.App. 2 Cir.1989). In that case, the defendant was charged with several sexual battery and molestation charges involving his children and their mother. During the trial, the court' advised the defendant's counsel twice, and then the defendant himself, that if the defendant persisted at staring at the witnesses and shaking his head affirmatively or negatively during their testimony, especially during the testimony of the minors, then the court would have the defendant removed from the courtroom. On appeal, the defendant argued that this threat infringed on his right to confront his accusers. The Second Circuit rejected this contention, noting that the court never prohibited the defendant from facing the witnesses; "rather, he admonished him not to stare at the witness in an intimidating manner and not to nod or shake his heard as if to prompt the witness." Id. at 965. The court found that "the warning was under the circumstances a reasonable exercise of the court's authority." Id. However, the appellate court also noted that the court's warning to the defendant was given outside the presence of the jury, and thus, "the jury could not have been adversely influenced by the judge's apparent disfavor with the defendant's conduct." Id. at 965.
As in Matthews but not in Roberts, the court's comments to the defendant in this case were given in front of the jury. However, in marked contrast to Matthews, the trial court did not intimate in any way that the defendant was threatening the witnesses. The court phrased its comments in general terms of discourtesy and distraction. Moreover, the trial court at the same time informed the jury that its comments were not to influence it. After defense counsel noted his general objection, the court further admonished the jury that it was not to consider its comments as a personal attack on the defendant.
The instant case is also distinguishable from the other case relied upon by the appellant, State v. Cook, 485 So.2d 606 (La.App. 4 Cir.1986). In Cook, the trial court gave piece of candy to the child rape victim after she concluded her testimony. On appeal, this Court found that the action of the court was reversible error as an improper comment on the veracity of the witness, which is prohibited under La. C.Cr.P. art. 772. Here, the trial court made no comments on the veracity of any of the witnesses.
In light of the complaint made by a witness at the motion hearing, the trial court did not abuse its discretion in telling the defendant to cease his distracting and discourteous behavior observed by the Court, especially given the admonishment to the jury. See LSA-C.Cr.P. art. 17: "[The Court] has the duty to require that criminal proceedings shall be conducted with dignity and in an orderly and expeditious manner and to so control the proceeding that justice is done." See also Code of Judicial Conduct, Canon 3(2): "A judge shall maintain order and decorum in judicial proceedings." This assignment of error lacks merit.
Appellant pro se was furnished with the record and given an opportunity to file a supplemental brief. No actual brief was received. The appellant did send a letter addressed to the clerk of court, which avers that the trial court tried to "change some documents" which he had received after his conviction. The appellant further avers that the documents, an apparent reference to the police report and subpoena in the burglary case which are attached to his letter, show that the detectives lied about the waiver of rights form and that he never signed the form. The appellant prays for a new trial.
*656 The record in this case contains a police report and list of evidence seized. It was prepared by Officer Carradine, and the narrative portion is handwritten; at the top of the first page, the box for "incident report" is checked off. The report attached to the appellant's correspondence is typewritten in part, was prepared by Detective Mims, and is noted to be the "supplemental report." However, it is not a complete report and consists of portions of another report judging from the page numbering. The initial report in the record was prepared March 8, 1998; the one provided by the appellant was prepared on March 9, 1998, the day after the murder. Obviously, these are not the same reports. One is the initial report prepared by the first on-scene officer, and the other is the supplemental report prepared by the lead homicide detective.
There is no indication of where the appellant obtained the report(s) he has provided to this Court. Furthermore, he does not explain what discrepancies, if any, have any significance. Assuming that this Court was willing to consider the documents given to the Court by the appellant as a part of the record of this appeal, which this Court normally would not, there are simply no issues argued by the appellant relative to the documents.
The appellant pro se also refers to not having signed the waiver of rights form. The issue of the waiver of rights form was fully explored at trial during the testimony of Major Hay. Specifically, the officer was cross-examined about the fact that the original waiver of rights form was not available on the first day of the motion hearing, although it was produced the next day. Defense counsel extensively questioned Major Hay about the fact that he also had a copy of the defendant's driver's license with him and was apparently comparing signatures between the driver's license and the rights form. During this extensive questioning, defense counsel attempted to prove that the defendant did not sign the form. The jury apparently concluded that the defendant had voluntarily waived his rights; there is nothing in the record to indicate that this decision was unjustified.

CONCLUSION
For the above and foregoing reasons, appellant's conviction and sentence are affirmed.
AFFIRMED.
NOTES
[1] A transcript of the defendant's statement was made and shown to the jury.